**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**ABILENE DIVISION**

| | | |
|---|---|---|
| **KYLIA SNIDER,** | § | |
| | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **V.** | § | **CAUSE NO. 1:26-cv-216-H** |
| | § | |
| **RES-CARE, INC. AND EDUCARE COMMUNITY LIVING CORPORATION - TEXAS,** | § | |
| | § | |
| | § | |
| | § | |
| **DEFENDANT.** | § | **JURY DEMANDED** |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

**Plaintiff Kylia Snider ("Plaintiff" or "Mrs. Snider")** files this First Amended Complaint and would respectfully show the Court as follows:

NATURE OF THE CASE

1. This is a sex and pregnancy discrimination case. **Defendants RES-CARE, INC. and EduCare Community Living Corporation (sometimes collectively "Defendants")** maintain a work environment that is hostile to women, and in particular, women who are nursing. Defendants failed to provide Mrs. Snider with an adequate private space to express breast milk, subjected her to harassment and derogatory comments about her nursing, and constructively discharged her.

PARTIES

2. Plaintiff is an individual who currently resides in Taylor County, Texas.

3. Defendant RES-CARE, INC. dba BrightSpring and/or BrightSpring Health Services. is a foreign for-profit corporation with its principal place of business in Louisville, Kentucky. RES-CARE does business in Texas and may be served through its registered agent, Corporation Service Company, 211 East 7th Street, Suite 620, Austin, TX 78701, or wherever it may be found.

4. Defendant EduCare Community Living Corporation - Texas is a domestic for-profit corporation doing business in Texas and may be served through its registered agent, Corporation Service Company, 211 East 7th Street, Suite 620, Austin, TX 78701, or wherever it may be found.

## JURISDICTION AND VENUE

5. Pursuant to 28 U.S.C. §§ 1331 and 1343, the Court has federal question jurisdiction because the action arises under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e-5(f)(3), including the Pregnancy Discrimination Act (PDA), as amended, 42 U.S.C. § 2000e(k); the Pregnant Workers Fairness Act (PWFA), 42 U.S.C. § 2000gg-2(a)(1); and the Providing Urgent Maternal Protections for Nursing Mothers Act (PUMP Act), an amendment to the Fair Labor Standards Act (FLSA), 29 U.S.C. § 207(r).

6. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claims which are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution.

7. Venue is proper in the U.S. District Court for the Northern District of Texas pursuant to 42 U.S.C. § 1391(b) because the unlawful practices alleged below were committed therein.

## FACTS

**RES-CARE and EduCare operate assisted living facilities throughout the U.S., including Abilene, Texas.**

8. RES-CARE is publicly traded on NASDAQ under the symbol BTSG. It is a conglomerate providing home and community-based healthcare services, focused on delivering complementary pharmacy and provider services to complex patients. RES-CARE has a differentiated approach to care delivery, with an integrated and scaled model that addresses critical services that the highest-need and highest-cost patients require. With a focus on Senior and Specialty patients, which includes Behavioral populations, their platform provides pharmacy and provider services (both clinical and supportive care in nature) in lower-cost home and community settings largely to Medicare, Medicaid, and commercially-insured populations.

9. RES-CARE is the parent company of EduCare.

10. RES-CARE and EduCare operate as a single integrated employer. Specifically, there is an interrelation of operations between RES-CARE and EduCare, such as shared HR, payroll, facilities, and equipment. There is common management between the two entities (overlapping managers or officers). There is centralized control of labor relations. There is common ownership or financial control between the two entities.

11. EduCare provides support to adults and children who need assistance with daily living due to a developmental, cognitive, or intellectual disability, and operates community living facilities across Texas, including the ResCare Community Living Center in Abilene, Texas.

12. In early March 2024, EduCare hires Mrs. Snider as an Office Coordinator at its facility in Abilene, Texas. All of the onboarding documents and HR policies refer to RES-CARE or BrightSpring.

**Mrs. Snider discloses her need to pump before she is hired.**

13. Mrs. Snider has recently given birth and is nursing her baby. Before accepting the position, Mrs. Snider advises HR Generalist Lisa Hernandez that she had recently given birth and needs a private place to express breast milk during the workday. Hernandez tells Mrs. Snider that EduCare can accommodate her request.

14. As an initial accommodation, Mrs. Snider is allowed to complete training from home before her first day in the office.

**Mrs. Snider is told to go to her car on her first day.**

15. On March 11, 2024, Mrs. Snider reports to the office for the first time. Her daughter is approximately six months old. (Mrs. Snider has three older children.) She immediately goes to Program Manager Tasha Yager and tells her she needs a private space to pump. Yager tells her she can use the conference room or the "dungeon." The dungeon is a locked room filled with broken chairs and boxes of old records. It does not even have a table. Every time she uses it, Mrs. Snider has to ask another employee for the key. Someone is always in the conference room.

16. Program Manager Tasha Yager tells Mrs. Snider to "just go to your car."

17. The parking lot is not private. Most of the employees from the office go outside to smoke in view of the parking lot.

18. Mrs. Snider tells Ms. Yager several times within her first month and almost every single week after that, that the options are not adequate.

19. With no adequate private space available, Mrs. Snider is forced to pump at her desk with a male coworker nearby – approximately three times a day.

**Area Supervisor Kiesha Matthews harasses Mrs. Snider about breastfeeding.**

20. Throughout Mrs. Snider's employment, Area Supervisor Keisha Matthews subjects Mrs. Snider to a pattern of harassment about her breastfeeding. Matthews tells Mrs. Snider that

she is "sick and disgusting" for wanting to breastfeed her baby and that it is a "sick pleasure." Matthews also gives Mrs. Snider a derogatory nickname in front of other employees: "Pumper."

21. Mrs. Snider is humiliated and distressed by this treatment. Her milk supply declines to the point that she is only producing approximately half of the intake her baby needs per day so she has to switch to formula. In the beginning, she is only taking about 20 minutes to pump. As time goes on, she is taking up to 45 minutes and still not getting what her baby needs.

22. In addition, Mrs. Snider has two bouts of mastitis. Mastitis is a painful inflammation of the breast tissue that often leads to a bacterial infection. It typically occurs when a milk duct becomes blocked or milk is not effectively drained from the breast due to infrequent feedings or missed pumping sessions.

**Mrs. Snider complains that the spaces offered are inadequate.**

23. Mrs. Snider attends training in the Brownwood corporate office on April 10, 2024. She complains to Client Benefit Coordinator Jenny Spruill that the places she has been offered to pump are not adequate. Ms. Spruill encourages Mrs. Snider to put her foot down.

24. The next day, Mrs. Snider complains to Program Manager Tasha Yager again that she needs an appropriate private place to pump.

**Mrs. Snider is forced to pump in front of a male client.**

25. On April 24, 2024, Mrs. Snider is required to transport a male client to an offsite appointment. Because she has no private space, Mrs. Snider is forced to pump in front of the male client who is known to have sexual behaviors.

**Mrs. Snider complains to HR.**

26. On or about April 26, 2024, Mrs. Snider meets with HR Generalist Lisa Hernandez and complains that she is not being given an adequate private space to pump, that she had been

forced to pump in front of a male coworker three times a day, and that she has been forced to pump in front of a male client. Mrs. Snider also brings information about the Providing Urgent Maternal Protections for Nursing Mothers Act (PUMP Act) and presents it to Program Manager Tasha Yager, who says she will "take a look at it." At a previous employer, Mrs. Snider had been forced to pump in her car for one of her previous children, and she was aware of the passage of the PUMP Act.

27. Defendants take no corrective action.

**Area Manager Keisha Matthews forces Mrs. Snider to forgo pumping – and then mocks her.**

28. On May 1, 2024 – just five days after Mrs. Snider's HR complaint – Area Manager Keisha Matthews sends Mrs. Snider a text message before work hours directing her to take a male client to an offsite appointment before 8:15 AM. Mrs. Snider tells Mathews that this is not part of her job description and that it will interfere with her pumping schedule. Matthews responds, "make that baby someone else's fucking problem," and tells Mrs. Snider she has no choice.

29. Mrs. Snider takes the client to the appointment. The appointment lasts approximately five hours. Because she cannot pump during the appointment, Mrs. Snider leaks through her shirt and onto her pants and returns to the office visibly soaked.

30. When Mrs. Snider returns, Area Manager Keisha Matthews comments in front of a male coworker: "Damn, your tits look huge." Program Manager Tasha Yager joins in and says: "They be looking huge." Both women then walk out of the room.

31. Mrs. Snider is humiliated. She clocks out and goes home. She agonizes over the decision and takes five hours to write her resignation letter. She resigns the next day, May 2, 2024, citing "ongoing harassment in the workplace."

32. EduCare does not respond to Mrs. Snider's resignation email. More than a week later, HR Generalist Lisa Hernandez leaves Mrs. Snider a voicemail requesting a written description of the harassment. No follow up or corrective action is ever taken.

33. After she quits, Mrs. Snider works hard to get her milk supply back. Although she is able to get back to about three quarters of her daughter's intake, she is forced to supplement with formula for the rest of their breastfeeding journey, which is absolutely devastating to Mrs. Snider for her last child.

## IMPORTANCE OF BREASTFEEDING

34. The numerous benefits of breastfeeding for both mother and child have long been known. The American Academy of Pediatrics recommends breastfeeding exclusively for at least the first six months after birth, and up to 2 years or beyond. Policy Statement: Breastfeeding and the Use of Human Milk, 150 Pediatrics e2022057988 (2022)(policy statement of the Am. Acad. of Pediatrics).

35. There are significant and proven benefits to breastfeeding children. Breast milk is widely accepted as the optimal source of nutrition for infants, and it provides numerous protections against illnesses and diseases for both infants and their mothers.

36. Breastfed babies generally have better immune system development and functioning because breastmilk contains antibodies that protect developing immune systems from disease. See Christine Spitzmeuller et al., *Got milk? Workplace factors related to breastfeeding among working mothers*, 37 J. Organiz. Behav. 692–718 (2016); Lawrence M. Grummer-Strawn & Nigel Rollins, *Summarising the Health Effects of Breastfeeding*, 104 Acta Paediatr. S1 (2015). As a result, babies who are breastfed tend to have fewer and less severe instances of certain short-term illnesses, including bacterial meningitis, diarrhea, lymphoma, leukemia,

hypercholesterolemia, and asthma. Lorraine Murtagh & Shawn Moulton, *Working Mothers, Breastfeeding, and the Law*, 101 Am. J. Public Health 217-233 (2011).

37. Breastfeeding is associated with a lower risk of childhood obesity. Joan Younger Meek & Lawrence Noble, *Technical Report: Breastfeeding and the Use of Human Milk*, 150 Pediatrics e2022057989 (2022).

38. According to a study by the Pew Research Center, in 2025, 59 percent of mothers with children under the age of 18 work full time. Rachel Minkin et al., *For Working Parents, the Boundary Between Work and Family is Often Blurred*, Pew Research Center Report (2026). Sixty percent of women in the U.S. do not meet their breastfeeding goals. Emily C. Odom et al., *Reasons for earlier than desired cessation of breastfeeding*, 131 Pediatrics e726 (2013).

39. Breastfeeding has benefits for society as a whole. One study showed that if 90 percent of women in the U.S. breastfed exclusively for six months, the United States would save the country $13 billion per year and prevent 911 infant deaths per year. Liz Morris et al., *Exposed: Discrimination Against Breastfeeding Workers,* Ctr. for WorkLife Law, at 7 (2019), https://worklifelaw.org/publication/exposed-discrimination-against-breastfeeding-workers/ (last visited June 25, 2026) (citing Melissa L. Bartick & Arnold Reinhold, *The burden of suboptimal breastfeeding in the United States: a pediatric cost analysis*, 125 Pediatrics e1048 (2010).

40. Mothers who do not breastfeed are subject to heightened health risks including breast and ovarian cancers, heart disease, postpartum depression, diabetes, and rheumatoid arthritis. Am. Acad. of Pediatrics, Policy Statement, *Breastfeeding and the Use of Human Milk*, 129 Pediatrics e827, 32 (2012).

WORKPLACE SAFETY RULES

41. Employers must maintain a workplace that is free of harassment and discrimination, including harassment based on sex and an employee's decision to breastfeed.

42. Employers must provide nursing employees with a private space, other than a bathroom, to express breast milk during the workday.

43. Employers must provide pregnant and nursing employees with the same accommodations provided to other employees.

44. Employers must not allow such a hostile work environment that an employee feels compelled to resign.

FIRST CAUSE OF ACTION – THE PUMP ACT

45. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

46. Since 2010, the Fair Labor Standards Act of 1938 ("FLSA") has required employers to provide nursing accommodations, but "[g]aps in the law limit access to [its] protections and le[ft] employees unable to recover in court when their employers fail to comply with the law's requirements." https://congress.gov/117/crpt/hrpt102/CRPT-117hrpt102.pdf.

47. The Providing Urgent Maternal Protections for Nursing Mothers Act (PUMP Act) amended the Fair Labor Standards Act (FLSA) to require employers to provide nursing employees with (1) reasonable break time to express breast milk for up to one year after the child's birth, and (2) a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public. 29 U.S.C. § 218d.

48. Plaintiff is an employee within the meaning of the FLSA and the PUMP Act.

49. Defendants are employers within the meaning of the FLSA and the PUMP Act.

50. At all relevant times, Mrs. Snider had recently given birth and was nursing her baby and was therefore entitled to the protections of the PUMP Act.

51. Defendants violated the PUMP Act by failing to provide Mrs. Snider with a place to express breast milk that was shielded from view and free from intrusion. Defendants' violations include but are not limited to: directing Mrs. Snider to pump in her car in a non-private public parking lot frequented by employees; requiring Mrs. Snider to pump at her desk in the presence of a male coworker approximately three times a day; requiring Mrs. Snider to transport a male client to a five-hour offsite appointment on May 1, 2024, despite her notification that the assignment would prevent her from pumping; and failing to provide any adequate private space throughout the duration of her employment, from March 2024 through her constructive discharge on May 2, 2024.

52. More than ten days prior to her constructive discharge, Mrs. Snider notified Program Manager Tasha Yager multiple times, including but not limited to April 11, 2024, after she returned from training in Brownwood, that Defendants had not provided a place for her to pump that complied with the PUMP Act.

53. Mrs. Snider even presented PUMP Act literature to Program Manager Tasha Yager on April 26, 2024. Defendants nonetheless took no corrective action.

54. As a direct and proximate result of Defendants' violations of the PUMP Act, Plaintiff suffered damages, including backpay, both economic and noneconomic compensatory damages, physical pain and suffering, and emotional distress. Plaintiff suffered harm to her ability to nurse, which is both an inconvenience and a loss of enjoyment of life. Plaintiff is entitled to front pay because reinstatement is not practicable.

55. Defendants' violations were willful. Plaintiff is entitled to liquidated damages on all equitable and compensatory damages (i.e. backpay, front pay, and compensatory damages, both economic and noneconomic) to effectuate the purposes of the PUMP Act. Liquidated damages are compensatory, not punitive, in nature and are intended to capture harms that cannot be precisely measured. An award of liquidated damages is necessary to deter employers from future violations.

56. Further, an award of punitive damages is appropriate to effectuate the purpose of the PUMP Act because Defendants acted with malice or with reckless indifference to Mrs. Snider's federally protected rights.

SECOND CAUSE OF ACTION – RETALIATION IN VIOLATION OF THE PUMP ACT

57. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

58. Plaintiff is an employee within the meaning of the FLSA and the PUMP Act.

59. Defendants are employers within the meaning of the FLSA and the PUMP Act.

60. At all relevant times, Mrs. Snider had recently given birth and was nursing her baby and was therefore entitled to the protections of the PUMP Act.

61. Plaintiff engaged in protected activity by (1) making a discrimination complaint to HR Generalist Lisa Hernandez on April 26, 2024 about the lack of adequate pumping space and ongoing harassment about her breastfeeding; (2) presenting PUMP Act literature to Program Manager Tasha Yager regarding Plaintiff's protected rights; and (3) objecting to Area Manager Keisha Matthews's harassment on multiple occasions throughout her employment. Plaintiff suffered materially adverse employment actions when, five days after her HR complaint, she was compelled to forgo pumping during a five-hour client appointment, subjected to vulgar comments about her body upon returning, and was constructively discharged. There is a causal connection

between Plaintiff's protected activity and Defendants' unlawful employment practices. Plaintiff suffered damages as a result of Defendants' conduct.

62. As a direct and proximate result of Defendants' violations of the PUMP Act, Plaintiff suffered damages, including backpay, both economic and noneconomic compensatory damages, physical pain and suffering, and emotional distress. Plaintiff suffered harm to her ability to nurse, which is both an inconvenience and a loss of enjoyment of life. Plaintiff is entitled to front pay because reinstatement is not practicable.

63. Defendants' violations were willful. Plaintiff is entitled to liquidated damages on all equitable and compensatory damages (i.e. backpay, front pay, and compensatory damages, both economic and noneconomic) to effectuate the purposes of the PUMP Act. Liquidated damages are compensatory, not punitive, in nature and are intended to capture harms that cannot be precisely measured. An award of liquidated damages is necessary to deter employers from future violations.

64. Further, an award of punitive damages is appropriate to effectuate the purpose of the PUMP Act because Defendants acted with malice or with reckless indifference to Mrs. Snider's federally protected rights.

<u>THIRD CAUSE OF ACTION – TITLE VII – SEX DISCRIMINATION</u>

65. Plaintiff is an employee within the meaning of Title VII and belongs to a class protected under the statute, namely she is female. *See* 42 U.S.C. § 2000e-5(f).

66. Defendants are employers within the meaning of Title VII. *See* 42 U.S.C. § 2000e(b).

67. Defendants violated Title VII with respect to the terms and conditions of Plaintiff's employment by subjecting her to a hostile work environment because she is female. This discrimination included but is not limited to subjecting Mrs. Snider to repeated derogatory and

offensive comments about her decision to breastfeed, calling her "sick and disgusting," assigning her the degrading nickname ("pumper"), making vulgar comments about her breasts in front of male coworkers, and constructively discharging Plaintiff because of her sex.

68. A reasonable person would have resigned under the same or similar circumstances.

69. As a direct and proximate result of Defendants' conduct, Plaintiff suffered damages. Defendants' conduct was willful and justifies an award of punitive damages.

## FOURTH CAUSE OF ACTION – TITLE VII & PDA – PREGNANCY DISCRIMINATION

70. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

71. Plaintiff is an employee within the meaning of Title VII and belongs to a class protected under the statute, namely she was pregnant and had recently given birth and was nursing. See 42 U.S.C. § 2000e(k).

72. Defendants are employers within the meaning of Title VII. See 42 U.S.C. § 2000e(b).

73. Defendants violated Title VII by subjecting Plaintiff to a hostile work environment and constructively discharging her because of or on the basis of her sex, which includes pregnancy, childbirth, and the related medical condition of lactation. See *EEOC v. Houston Funding II Ltd.*, 717 F.3d 425, 427 (5th Cir. 2013). Defendants' actions include but are not limited to failing to provide Mrs. Snider with an adequate private space to express breast milk; directing her to pump in her car; forcing her to pump at her desk in front of a male coworker three times a day; forcing her to pump in front of a male client; subjecting her to derogatory comments about her nursing; assigning her a degrading nickname ("Pumper"); requiring her to forgo pumping during a five-hour client appointment; and making vulgar comments about her body when she returned soaked.

74. A reasonable person would have resigned under the same or similar circumstances.

75. As a direct and proximate result of Defendants' conduct, Plaintiff suffered damages. Defendants' conduct was willful and justifies an award of punitive damages.

FIFTH CAUSE OF ACTION – RETALIATION IN VIOLATION OF TITLE VII

76. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

77. Plaintiff is an employee within the meaning of Title VII and belongs to a class protected under the statute, namely she is female. *See* 42 U.S.C. § 2000e-5(f).

78. Defendants are employers within the meaning of Title VII. *See* 42 U.S.C. § 2000e(b).

79. Plaintiff engaged in protected activity by (1) making a discrimination complaint to HR Generalist Lisa Hernandez on April 26, 2024 about the lack of adequate pumping space and ongoing harassment about her breastfeeding; (2) presenting PUMP Act literature to Program Manager Tasha Yager regarding Plaintiff's protected rights; and (3) objecting to Area Manager Keisha Matthews's harassment on multiple occasions throughout her employment. Plaintiff suffered materially adverse employment actions when, five days after her HR complaint, she was compelled to forgo pumping during a five-hour client appointment, subjected to vulgar comments about her body upon returning, and was constructively discharged. There is a causal connection between Plaintiff's protected activity and Defendants' unlawful employment practices. Plaintiff suffered damages as a result of Defendants' conduct. Defendants' conduct was willful and justifies an award of punitive damages.

SIXTH CAUSE OF ACTION – PWFA – FAILURE TO ACCOMMODATE

80. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

81. Plaintiff is an employee within the meaning of the Pregnant Workers Fairness Act (PWFA), 42 U.S.C. § 2000gg(3)(A), which incorporates the definition in Title VII, 42 U.S.C. § 2000e(f).

82. Defendants are a covered entity within the meaning of the PWFA, 42 U.S.C. § 2000gg(2).

83. Defendants violated 42 U.S.C. § 2000gg-1(1), (2), (3), and (5) by:

a. failing to make reasonable accommodation to the known limitations related to Plaintiff's pregnancy and related medical conditions, including lactation;

b. requiring Plaintiff to accept an accommodation other than a reasonable accommodation arrived at through the interactive process;

c. denying Plaintiff employment opportunities based on the need to make reasonable accommodations; and/or

d. taking adverse action against Plaintiff in the terms, conditions, and privileges of her employment.

84. Defendants' wrongful conduct includes but is not limited to:

a. Failing to provide Mrs. Snider with an adequate private space to express breast milk as a reasonable accommodation for her known limitation of lactation, despite her pre-hire disclosure of the need and her repeated subsequent requests;

b. Directing Mrs. Snider to pump in her car in a non-private, public parking lot;

c. Requiring Mrs. Snider to pump at her desk in front of a male coworker approximately three times a day;

d. Failing to participate in the interactive process to determine what, if any, reasonable accommodation would be needed;

e. Creating a hostile work environment; and

f. Constructively discharging Mrs. Snider.

85. As a direct and proximate result of Defendants' conduct, Plaintiff suffered damages and is entitled to backpay, front pay, and compensatory damages (both economic and noneconomic). Defendants' conduct was willful and justifies an award of punitive damages.

SEVENTH CAUSE OF ACTION – RETALIATION IN VIOLATION OF THE PWFA

86. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

87. Plaintiff is an employee within the meaning of the Pregnant Workers Fairness Act (PWFA), 42 U.S.C. § 2000gg(3)(A), which incorporates the definition in Title VII, 42 U.S.C. § 2000e(f).

88. Defendants are a covered entity within the meaning of the PWFA, 42 U.S.C. § 2000gg(2).

89. Plaintiff engaged in protected activity by (1) making a discrimination complaint to HR Generalist Lisa Hernandez on April 26, 2024 about the lack of adequate pumping space and ongoing harassment about her breastfeeding; (2) presenting PUMP Act literature to Program Manager Tasha Yager regarding Plaintiff's protected rights; and (3) objecting to Area Manager

Keisha Matthews's harassment on multiple occasions throughout her employment. Plaintiff suffered materially adverse employment actions when, five days after her HR complaint, she was compelled to forgo pumping during a five-hour client appointment, subjected to vulgar comments about her body upon returning, and was constructively discharged.

90. Defendants interfered with Mrs. Snider's statutory right to be free of coercion, intimidation, harassment, and threats in exercising her rights under the PWFA in violation of 42 U.S.C. § 2000gg-1(f)(2).

91. There is a causal connection between Plaintiff's protected activity and Defendants' unlawful employment practices. Plaintiff suffered damages as a result of Defendants' conduct and is entitled to backpay, front pay, and compensatory damages (both economic and noneconomic). Defendants' conduct was willful and justifies an award of punitive damages.

EIGHTH CAUSE OF ACTION –SEX AND/OR PREGNANCY DISCRIMINATION - TEXAS LAW (TCHRA)

92. Plaintiff is an employee within the meaning of the Texas Commission on Human Rights Act (TCHRA), Texas Labor Code § 21.002(7) and belongs to the class of employees protected under the statute, namely, female employees. See Texas Labor Code § 21.101.

93. Defendants are an employer within the meaning of Texas Labor Code § 21.002(8).

94. Defendants intentionally discriminated against Plaintiff because of her sex and/or pregnancy in violation of the Texas Labor Code by subjecting her to a hostile working environment, retaliating against her, and constructively discharging her. As a direct and proximate cause of Defendants' conduct, Plaintiff suffered damages. Defendants' conduct was willful and justifies an award of punitive damages.

## AGENCY

95. As Area Supervisor and Program Manager, Keisha Matthews and Tasha Yager are agents of Defendants, and Defendants are vicariously liable for their actions which were taken in the course and scope of their employment. Alternatively, Defendants were negligent because they knew or should have known about the harassment and discrimination and failed to stop it.

## EXHAUSTION OF ADMINISTRATIVE PROCEDURES

96. Plaintiff timely filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission (EEOC) against each Defendant on or about October 29, 2024, Charge No. 450-2025-01024 and Charge No. 450-2025-01025. Under the Work-Sharing Agreement between the EEOC and the Texas Workforce Commission Civil Rights Division (CRD), the Charge was deemed to be dually filed with CRD. Plaintiff timely filed her Complaint within ninety days of receiving the Right to Sue Notice on or about February 25, 2026.

## CONDITIONS PRECEDENT

97. All conditions precedent have been performed or have occurred.

## DAMAGES

98. Reinstatement is not practicable. Plaintiff has made diligent efforts to find comparable alternate employment. Plaintiff has suffered actual damages in the form of past and future lost wages, fringe benefits, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses. Plaintiff is entitled to liquidated damages under the PUMP Act. Plaintiff is entitled to punitive damages.

## ATTORNEYS' FEES

99. Plaintiff was forced to engage counsel to protect her rights. Plaintiff is entitled to an award of attorneys' fees and costs (including but not limited to an award of reasonable expert

witness fees) pursuant to 42 U.S.C. § 2000e-5(k), 29 U.S.C. § 216(b), and/or Texas Labor Code § 21.259.

## INTEREST

100. Plaintiff is entitled to prejudgment and post judgment interest at the highest lawful rate.

## JURY TRIAL DEMAND

101. Plaintiff demands a jury trial.

## PRAYER

**WHEREFORE**, Plaintiff prays for judgment against Defendants for the following:

a. Past and future compensatory damages as alleged above;

b. Past and future lost wages and benefits (backpay and front pay);

c. Liquidated damages;

d. Punitive damages;

e. Attorneys' fees and costs;

f. Prejudgment and post-judgment interest;

g. Such other and further relief, at law or in equity, to which Plaintiff may show herself justly and lawfully entitled.

Respectfully submitted,

By: /s/ Holly B. Williams
Holly B. Williams
Texas Bar No. 00788674

**WILLIAMS LAW FIRM, P. C.**
1209 W Texas Ave
Midland, TX 79701-6173
432-682-7800
432-682-1112 (fax)
holly@williamslawpc.com

Kyla Gail Cole
Texas State Bar No. 24033113
**COLE/LEGLER PLLC**
3300 Oak Lawn Avenue, Suite 425
Dallas, TX 75219
(214) 748-7777
(214) 748 7778 (fax)
kyla@nlcemployeelaw.com

**ATTORNEY FOR PLAINTIFF**
**KYLIA SNIDER**