**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**ABILENE DIVISION**

| | | |
|---|---|---|
| **KYLIA SNIDER,** | § | |
| | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **V.** | § | **CAUSE NO. 1:26-cv-216-H** |
| | § | |
| **RES-CARE, INC. AND EDUCARE COMMUNITY LIVING CORPORATION - TEXAS,** | § | |
| | § | |
| | § | |
| | § | |
| **DEFENDANT.** | § | **JURY DEMANDED** |

# PLAINTIFF'S SECOND AMENDED COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

**Plaintiff Kylia Snider ("Plaintiff" or "Mrs. Snider")** files this Second Amended Complaint and would respectfully show the Court as follows:

## NATURE OF THE CASE

1. This is a sex and pregnancy discrimination case. **Defendants RES-CARE, INC. and EduCare Community Living Corporation - Texas (sometimes collectively "Defendants")** maintain a work environment that is hostile to women, and in particular, women who are nursing. Defendants failed to provide Mrs. Snider with an adequate private space to express breast milk, subjected her to harassment and derogatory comments about her nursing, and constructively discharged her.

## PARTIES

2. Plaintiff is an individual who currently resides in Taylor County, Texas.

3. Defendant RES-CARE, INC. dba BrightSpring and/or BrightSpring Health Services. is a foreign for-profit corporation with its principal place of business in Louisville, Kentucky. RES-CARE does business in Texas and may be served through its registered agent, Corporation Service Company, 211 East 7th Street, Suite 620, Austin, TX 78701, or wherever it may be found.

4. Defendant EduCare Community Living Corporation - Texas is a domestic for-profit corporation doing business in Texas and may be served through its registered agent, Corporation Service Company, 211 East 7th Street, Suite 620, Austin, TX 78701, or wherever it may be found.

## JURISDICTION AND VENUE

5. Pursuant to 28 U.S.C. §§ 1331 and 1343, the Court has federal question jurisdiction because the action arises under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e-5(f)(3), including the Pregnancy Discrimination Act (PDA), as amended, 42 U.S.C. § 2000e(k); the Pregnant Workers Fairness Act (PWFA), 42 U.S.C. § 2000gg-2(a)(1); and the Providing Urgent Maternal Protections for Nursing Mothers Act (PUMP Act), an amendment to the Fair Labor Standards Act (FLSA), 29 U.S.C. § 207(r).

6. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claims which are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution.

7. Venue is proper in the U.S. District Court for the Northern District of Texas pursuant to 42 U.S.C. § 1391(b) because the unlawful practices alleged below were committed therein.

## FACTS

**RES-CARE and EduCare operate assisted living facilities throughout the U.S., including Abilene, Texas.**

8. At the relevant time, RES-CARE was owned by BrightSpring Health Services, Inc., which is publicly traded on NASDAQ under the symbol BTSG. It is a conglomerate providing home and community-based healthcare services, focused on delivering complementary pharmacy and provider services to complex patients. RES-CARE has a differentiated approach to care delivery, with an integrated and scaled model that addresses critical services that the highest-need and highest-cost patients require. With a focus on Senior and Specialty patients, which includes behavioral populations, their platform provides pharmacy and provider services (both clinical and supportive care in nature) in lower-cost home and community settings largely to Medicare, Medicaid, and commercially-insured populations.

9. During the relevant time, RES-CARE was affiliated with EduCare, but discovery is needed to determine the exact nature of the relationship. (On March 31, 2026, BrightSpring announced the sale of RES-CARE to Sevita, a leading provider of home and community-based specialty health care.)

10. RES-CARE, Inc. is also known as Res-Care, ResCare, and Rescare.

11. EduCare Community Living Corp – Texas is also known as EduCare and Educare.

12. EduCare and/or RES-CARE provide support to adults and children who need assistance with daily living due to a developmental, cognitive, or intellectual disability, and operate community living facilities across Texas, including the ResCare Community Living Center in Abilene, Texas and the ResCare Community Living Center in Brownwood, Texas

13. RES-CARE and EduCare operated as a single integrated employer. Specifically, there was an interrelation of operations between RES-CARE and EduCare, such as shared HR,

payroll, facilities, and equipment. There was common management between the two entities (overlapping managers or officers). There is common ownership or financial control between the two entities.

14. For example, the Texas Franchise Tax Public Information Reports on file with the Texas Secretary of State's office for report years 2023 and 2024 list RES-CARE's principal office address and principal place of business as 805 N Whittington Parkway, Louisville, KY 40222.

15. The Texas Franchise Public Information Reports on file with the Texas Secretary of State's office for report year 2023 and 2024 list Educare's principal office address and principal place of business as the same address as RES-CARE: 805 N Whittington Parkway, Louisville, KY 40222.

16. Jennifer Phipps and Allison L Brown are listed as officers of both entities.

**Mrs. Snider is hired for the RES-CARE Community Living Center in Abilene.**

17. In early March 2024, Mrs. Snider is hired as an Office Coordinator at the ResCare Community Living Facility in Abilene, Texas. Mrs. Snider receives her offer of employment by email from Ashleigh Agan showing Ms. Agan's email as ashleigh.agan@rescare.com. The subject line of Mrs. Snider's offer of employment is "Your BrightSpring Offer!" The email states that Mrs. Snider is being offered the position of "OFFICE COORDINATOR at ResCare Community Living."

18. To respond to the offer, Mrs. Snider is directed to a link to the "BrightSpring Health Service career website."

19. Throughout the onboarding process, Mrs. Snider deals with Ashleigh Agan. Agan identifies herself via text message as the "HRA for Rescare." Agan provides Mrs. Snider her RES-CARE onboarding documents and helped arrange her at-home training.

20. All of the onboarding documents and HR policies refer to RES-CARE or BrightSpring. The domain for all employees' email addresses is @rescare.com, like Ms. Agan's. The company-owned laptop that is issued to Mrs. Snider has a RES-CARE logo for the background. Mrs. Snider is assigned an email address @rescare.com to use during her employment.

21. Mrs. Snider is told that she is assigned to the ResCare Community Living Center in Abilene and that she reports to both regional management and has a dotted line to corporate accounting personnel George Dudley.

22. Mrs. Snider is asked to attend training at the "corporate office" in Brownwood. The Brownwood corporate office is inside the RES-CARE Community Living Center in Brownwood, Texas. Mrs. Snider understands the corporate employees in Brownwood to be employees of RES-CARE, including her dotted line manager George Dudley, HR Generalist Lisa Hernandez, and Client Benefit Coordinator Jenny Spruill.

23. In the two months that Mrs. Snider works at the Abilene facility, no one mentions "EduCare" although EduCare issues Mrs. Snider's paycheck. Nobody refers to themselves as an employee of EduCare or RES-CARE. Everyone refers to themselves as "regional" or "corporate." Everyone refers to the entire operation as RES-CARE or BrightSpring.

**<u>Mrs. Snider discloses her need to pump before she is hired and requests accommodation.</u>**

24. Mrs. Snider has recently given birth and is nursing her baby. Before accepting the position, Mrs. Snider advised RES-CARE HR Generalist Lisa Hernandez that she has recently had a baby and needs a private place to pump during the workday. Hernandez tells Mrs. Snider that they can accommodate her request.

25. RES-CARE HRA Ashleigh Agan informs Mrs. Snider that they will allow her to complete training from home before her first day in the office, as an initial accommodation. RES-CARE HRA Ashleigh

Agan texts Mrs. Snider that "I had spoke with my supervisor this morning about this."

**Mrs. Snider is told to go to her car on her first day.**

26. On March 11, 2024, Mrs. Snider reports to the RES-CARE Community Living Center in Abilene for the first time. Her daughter is approximately six months old. (Mrs. Snider has three older children.) She immediately goes to Program Manager Tasha Yager and tells her she needs a private space to pump. Yager tells her she can use the conference room or the "dungeon."

27. The dungeon is not functional as a lactation space. It is a locked room filled with broken chairs and boxes of old records. It is not clean. It does not even have a table. The dungeon does not have a place for Mrs. Snider to sit and a flat surface, other than the floor, for her to put her pump. The dungeon is not accessible as every time she uses it, Mrs. Snider has to locate the only employee who has a key and ask her to unlock the door. Then, the employee takes the key with her. So, the dungeon is not free from intrusion.

28. The conference room is not available every time Mrs. Snider needs to use it. It is neither private nor free from intrusion. It is in almost constant use for meetings. It has external windows that face the parking lot.

29. When she complains, Program Manager Tasha Yager tells Mrs. Snider to "just go to your car."

30. The car is not private because of its windows. The parking lot is not private. Most of the employees from the office go outside to smoke in view of the parking lot and the conference room.

31. Mrs. Snider tells Ms. Yager several times within her first month and almost every single week after that, that the options are not adequate.

32. Mrs. Snider tries using a wearable breast pump. A wearable breast pump is a cordless, battery-operated device the fits directly inside a nursing bra and allows milk to be expressed hands-free. Mrs. Snider wears oversized clothes to try to conceal the pumps.

33. Wearable breast pumps generally are not as effective at emptying breasts as pumps that are used on a table, and users of wearable pumps have an increased risk of mastitis. Mastitis is a painful inflammation of the breast tissue that often leads to a bacterial infection. It typically occurs when a milk duct becomes blocked or milk is not effectively drained from the breast due to infrequent feedings or missed pumping sessions.

34. Wearable pumps are also inconvenient because they have to be charged. They are uncomfortable and must be cleaned, just like other pumps, to avoid contamination.

35. The use of wearable pumps requires regular breaks. Mrs. Snider is not allowed to take breaks and is expected to continue working while she is pumping, including answering the phone. When she requests a break, or even lunch, she is told that "this is not the type of industry in which people take breaks or lunch," or words to that effect. One time, she pumps in the bathroom because her wearable pumps are not working properly, and she receives a verbal warning from Program Manager Tasha Yager.

36. With no adequate private space available and without breaks, Mrs. Snider is forced to pump at her desk with a male coworker nearby – approximately three times a day. **Area Supervisor Keisha Matthews harasses Mrs. Snider about breastfeeding.**

37. Throughout Mrs. Snider's employment, Area Supervisor Keisha Matthews subjects Mrs. Snider to a pattern of harassment about her breastfeeding. Matthews tells Mrs. Snider that she is "sick and disgusting" for wanting to breastfeed her baby and that it is a "sick pleasure." Matthews also gives Mrs. Snider a derogatory nickname in front of other employees: "Pumper."

38. Mrs. Snider is humiliated and distressed by this treatment. Her milk supply declines to the point that she is only producing approximately half of the intake her baby needs per day so she has to add formula. In the beginning, she is only taking about 20 minutes to pump. As time goes on, due to stress and inadequate breaks, she is taking up to 45 minutes and still not getting what her baby needs. In addition, Mrs. Snider has two bouts of mastitis.

**Mrs. Snider complains that the spaces offered are inadequate.**

39. Mrs. Snider attends training in the Brownwood corporate office on April 10, 2024. She complains to RES-CARE Client Benefit Coordinator Jenny Spruill that the places she has been offered to pump are not adequate. Ms. Spruill encourages Mrs. Snider to put her foot down.

40. The next day, Mrs. Snider complains to Program Manager Tasha Yager again and requests accommodation so that she can have an appropriate private place to pump.

**Mrs. Snider is forced to pump in front of a male client.**

41. On April 24, 2024, Mrs. Snider is required to transport a male client to an offsite appointment. Because she has no private space, Mrs. Snider is forced to pump in front of the male client who is known to have sexual behaviors.

**Mrs. Snider complains to HR.**

42. On or about April 26, 2024, Mrs. Snider meets with RES-CARE HR Generalist Lisa Hernandez and complains that she is not being given an adequate private space to pump, that she had been forced to pump in front of a male coworker three times a day, and that she has been forced to pump in front of a male client. Mrs. Snider also brings information about the Providing Urgent Maternal Protections for Nursing Mothers Act (PUMP Act) and presents it to Program Manager Tasha Yager, who says she will “take a look at it.” At a previous employer, Mrs. Snider

had been forced to pump in her car for one of her previous children, and she was aware of the passage of the PUMP Act.

**Area Manager Keisha Matthews forces Mrs. Snider to forgo pumping – and then mocks her.**

43. On May 1, 2024 – just five days after Mrs. Snider's HR complaint – Area Manager Keisha Matthews sends Mrs. Snider a text message before work hours directing her to take a male client to an offsite appointment before 8:15 a.m.. Mrs. Snider tells Mathews that this is not part of her job description and that it will interfere with her pumping schedule. Matthews responds, "Make that baby someone else's fucking problem," and tells Mrs. Snider she has no choice.

44. Mrs. Snider takes the client to the appointment. The appointment lasts approximately five hours and denies Mrs. Snider the ability to take pumping breaks. Because she cannot pump during the appointment, Mrs. Snider leaks through her shirt and onto her pants and returns to the office visibly soaked.

45. When Mrs. Snider returns, Area Manager Keisha Matthews comments in front of a male coworker: "Damn, your tits look huge." Program Manager Tasha Yager joins in and says: "They be looking huge." Both women then walk out of the room.

46. Mrs. Snider is humiliated. She clocks out and goes home. She agonizes over the decision and takes five hours to write her resignation letter. She resigns the next day, May 2, 2024, via email from her @rescare.com email address, citing "ongoing harassment in the workplace."

47. No one responds to Mrs. Snider's resignation email. More than a week later, HR Generalist Lisa Hernandez leaves Mrs. Snider a voicemail requesting a written description of the harassment. No follow up or corrective action is ever taken.

48. After she quits, Mrs. Snider works hard to get her milk supply back. Although she is able to get back to about three quarters of her daughter's intake, she is forced to supplement with

formula for the rest of their breastfeeding journey, which is absolutely devastating to Mrs. Snider for her last child.

IMPORTANCE OF BREASTFEEDING

49. The numerous benefits of breastfeeding for both mother and child have long been known. The American Academy of Pediatrics recommends breastfeeding exclusively for at least the first six months after birth, and to continue to be breastfed, alongside food for one year, or beyond. Policy Statement: Breastfeeding and the Use of Human Milk, 129150 Pediatrics e2022057988 (2022)(policy statement of the Am. Acad. of Pediatrics).

50. The majority of mothers in the United States start out breastfeeding their babies. In 2023, 86.1 percent of infants started out breastfeeding. https://www.cdc.gov/breastfeeding-data/survey/results.html. At six months, the rate drops to only 29.8 percent who are exclusively breastfed. *Id.*

51. There are significant and proven benefits to breastfeeding children. Breast milk is widely accepted as the optimal source of nutrition for infants, and it provides numerous protections against illnesses and diseases for both infants and their mothers.

52. Breastfed babies generally have better immune system development and functioning because breastmilk contains antibodies that protect developing immune systems from disease. See Christine Spitzmeuller et al., *Got milk? Workplace factors related to breastfeeding among working mothers*, 37 J. Organiz. Behav. 692–718 (2016); Lawrence M. Grummer-Strawn & Nigel Rollins, *Summarising the Health Effects of Breastfeeding*, 104 Acta Paediatr. S1 (2015). As a result, babies who are breastfed tend to have fewer and less severe instances of certain short-term illnesses, including bacterial meningitis, diarrhea, lymphoma, leukemia,

hypercholesterolemia, and asthma. Lorraine Murtagh & Shawn Moulton, *Working Mothers, Breastfeeding, and the Law*, 101 Am. J. Public Health 217-233 (2011).

53. Breastfeeding is associated with a lower risk of childhood obesity. Joan Younger Meek & Lawrence Noble, *Technical Report: Breastfeeding and the Use of Human Milk*, 150 Pediatrics e2022057989 (2022).

54. According to a study by the Pew Research Center, in 2025, 59 percent of mothers with children under the age of 18 work full time. Rachel Minkin et al., *For Working Parents, the Boundary Between Work and Family is Often Blurred*, Pew Research Center Report (2026). Sixty percent of women in the U.S. do not meet their breastfeeding goals. Emily C. Odom et al., *Reasons for earlier than desired cessation of breastfeeding*, 131 Pediatrics e726 (2013).

55. Breastfeeding has benefits for society as a whole. One study showed that if 90 percent of women in the U.S. breastfed exclusively for six months, the United States would save the country $13 billion per year and prevent 911 infant deaths per year. Liz Morris et al., *Exposed: Discrimination Against Breastfeeding Workers,* Ctr. for WorkLife Law, at 7 (2019), https://worklifelaw.org/publication/exposed-discrimination-against-breastfeeding-workers/ (last visited June 25, 2026) (citing Melissa L. Bartick & Arnold Reinhold, *The burden of suboptimal breastfeeding in the United States: a pediatric cost analysis*, 125 Pediatrics e1048 (2010).

56. Mothers who do not breastfeed are subject to heightened health risks including breast and ovarian cancers, heart disease, postpartum depression, diabetes, and rheumatoid arthritis. Am. Acad. of Pediatrics, Policy Statement, *Breastfeeding and the Use of Human Milk*, 129 Pediatrics e827, 32 (2012).

LEGISLATIVE INTENT AND SOCIETAL BENEFIT

57. Everyone – employers, employees, and society as a whole – benefits when pregnant employees can continue to work. Laws such as the PUMP Act, the PWFA, and the PDA exist to allow pregnant employees to work safely and maintain the health of their pregnancies while simultaneously allowing employers to have the advantage of retaining trained, experienced employees. These benefits last past pregnancy as healthier babies and healthier mothers lead to reduced absenteeism, greater productivity, and families' financial stability.

58. The purpose of the PDA is to establish that employment discrimination based on pregnancy, childbirth, or related medical conditions is unlawful.

59. The purpose of the PWFA is to ensure that women do not have to choose between their job and their health or the health of their pregnancy. It protects families' financial health and women's pregnancy and child-birth-related health, including lactation.

60. The purpose of the PUMP Act is to allow working mothers to continue breastfeeding for up to one year after birth "to promote the health and well-being of nursing employees and infants."

WORKPLACE SAFETY RULES

61. Employers must maintain a workplace that is free of harassment and discrimination, including harassment based on sex and an employee's decision to breastfeed.

62. Employers must provide nursing employees with a private space, other than a bathroom, to express breast milk during the workday.

63. Employers must provide pregnant and nursing employees with the same accommodations provided to other employees.

64. Employers must not allow such a hostile work environment that an employee feels compelled to resign.

FIRST CAUSE OF ACTION – THE PUMP ACT

65. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

66. Since 2010, the Fair Labor Standards Act of 1938 ("FLSA") has required employers to provide nursing accommodations, but "[g]aps in the law limit access to [its] protections and le[ft] employees unable to recover in court when their employers fail to comply with the law's requirements." https://congress.gov/117/crpt/hrpt102/CRPT-117hrpt102.pdf.

67. The Providing Urgent Maternal Protections for Nursing Mothers Act (PUMP Act) amended the Fair Labor Standards Act (FLSA) to require employers to provide nursing employees with (1) reasonable break time to express breast milk for up to one year after the child's birth, and (2) a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public. 29 U.S.C. § 218d.

68. An employer is required to provide reasonable break time "each time [the] employee has need to express the milk." The frequency and duration of breaks varies on factors relating to the nursing employee and the child. Other factors include the location of the space, the steps reasonably necessary to express breast milk, and pump setup. https://www.dol.gov/agencies/whd/fact-sheets/73-flsa-break-time-nursing-mothers.

69. Plaintiff is an employee within the meaning of the FLSA and the PUMP Act.

70. Defendants are employers within the meaning of the FLSA and the PUMP Act. Specifically, the FLSA defines an employer as "any person acting directly or indirectly in the

interest of any employer in relation to an employee." 29 U.S.C. § 203(d). Both Educare and RES-CARE acted directly or indirectly in the interest of an employer in relation to Mrs. Snider.

71. At all relevant times, Mrs. Snider had recently given birth and was nursing her baby and was therefore entitled to the protections of the PUMP Act.

72. Defendant violated the PUMP Act by failing to provide Mrs. Snider with reasonable duty-free break times. This included, among other things, requiring her to take a client for a five-hour offsite appointment during which she could not take a break and denying her break time to attend to her wearable breast pumps.

73. Defendants violated the PUMP Act by failing to provide Mrs. Snider with a place to express breast milk that was shielded from view and free from intrusion. If the employer does not provide a permanent, dedicated space for nursing mothers, the space must be "available when needed in order to meet the statutory requirement." https://www.dol.gov/agencies/whd/fact-sheets/73-flsa-break-time-nursing-mothers.

74. The "dungeon" does not meet the statutory requirement because it was not available when needed. Specifically, Mrs. Snider had to obtain the only key from an employee who was not always available. The dungeon was not free from intrusion because that employee kept the key while Mrs. Snider was in the dungeon. Courts have interpreted the requirement that the space be "other than a bathroom" as requiring a clean space. The dungeon was not clean, and it did not provide a space for Mrs. Snider to sit and a flat space other than the floor for a pump.

75. The conference room does not meet the statutory requirement because it was not available when needed, was not shielded from view, and was not clean.

76. Defendants' violations include but are not limited to: directing Mrs. Snider to pump in her car in a non-private public parking lot frequented by employees; requiring Mrs. Snider to

pump at her desk in the presence of a male coworker approximately three times a day; requiring Mrs. Snider to transport a male client to a five-hour offsite appointment on May 1, 2024, despite her -objection that the assignment would prevent her from pumping; and failing to provide any adequate private space throughout the duration of her employment, from March 2024 through her constructive discharge on May 2, 2024.

77. The PUMP Act requires an employee to give 10 days' notice of the employer's failure to provide appropriate space before filing suit. 29 U.S.C. § 218d(g)(1). The PUMP Act does not require the notice to be in writing. The notice requirement does not apply to break time violations or retaliation.

78. Mrs. Snider complied with the PUMP Act's notification requirements. Specifically, more than ten days prior to her constructive discharge, Mrs. Snider notified Program Manager Tasha Yager multiple times, including but not limited to April 11, 2024, after she returned from training in Brownwood, that an appropriate space had not been provided that complied with the PUMP Act. Additionally, she notified RES-CARE HRA Ashleigh Agan and RES-CARE HR Generalist Lisa Hernandez of her need for a private place to pump.

79. Mrs. Snider even presented PUMP Act literature to Program Manager Tasha Yager on April 26, 2024. Defendants nonetheless took no corrective action.

80. Alternatively, Mrs. Snider was not required to provide 10 days' notice because her situation falls within one or more of the exceptions to the notice requirement contained in 29 U.S.C. § 218d(g)(2). Specifically, the PUMP Act provides that an employee is not required to give notice if the employee has been discharged because she made a request for break time or an appropriate place to pump or opposed any employer conduct related to the Act or if the employer has indicated that it has no intention of providing an appropriate space. 29 U.S.C. § 218d(g)(2)(A)-

(B). As more fully described below, Mrs. Snider was constructively discharged, which is the equivalent of discharge, because she made a request for an appropriate place to pump and/or break time. Defendants' managers and employees, including but not limited to HR Generalist Lisa Hernandez, Program Manager Tasha Yager, and Area Manager Keisha Matthews, expressed their disdain for Mrs. Snider's situation and through their actions and words demonstrated an intent not to comply with the law.

81. As a direct and proximate result of Defendants' violations of the PUMP Act, Plaintiff suffered damages, including backpay, both economic and noneconomic compensatory damages, physical pain and suffering, and emotional distress. Plaintiff suffered harm to her ability to nurse, which is both an inconvenience and a loss of enjoyment of life. Plaintiff is entitled to front pay because reinstatement is not practicable.

82. Defendants' violations were willful. Plaintiff is entitled to liquidated damages on all equitable and compensatory damages (i.e. backpay, front pay, and compensatory damages, both economic and noneconomic) to effectuate the purposes of the PUMP Act. Liquidated damages are compensatory, not punitive, in nature and are intended to capture harms that cannot be precisely measured. An award of liquidated damages is necessary to deter employers from future violations.

83. Further, an award of punitive damages is appropriate to effectuate the purpose of the PUMP Act because Defendants acted with malice or with reckless indifference to Mrs. Snider's federally protected rights.

<u>SECOND CAUSE OF ACTION – RETALIATION IN VIOLATION OF THE PUMP ACT</u>

84. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

85. Plaintiff is an employee within the meaning of the FLSA and the PUMP Act.

86. Defendants are employers within the meaning of the FLSA and the PUMP Act.

87. At all relevant times, Mrs. Snider had recently given birth and was nursing her baby and was therefore entitled to the protections of the PUMP Act.

88. Plaintiff engaged in protected activity by (1) making a discrimination complaint to RES-CARE HR Generalist Lisa Hernandez on April 26, 2024 about the lack of adequate pumping space and ongoing harassment about her breastfeeding; (2) presenting PUMP Act literature to Program Manager Tasha Yager regarding Plaintiff's protected rights; and (3) objecting to Area Manager Keisha Matthews's harassment on multiple occasions throughout her employment.

89. Plaintiff was subjected to materially adverse employment actions that might dissuade a reasonable worker from making or supporting protected activity, including being subjected to a retaliatory hostile work environment and discouraged from exercising her statutory right to take breaks, being issued a verbal warning for taking a break for pumping, made anxious about her breast health and her ability to feed her infant, made to endure painful mastitis, compelled to forgo pumping during a five-hour client appointment, and subjected to vulgar comments about her body upon returning.

90. When Mrs. Snider objected to being assigned to taking the male client offsite to attend his appointment because it would interfere with her pumping schedule, Area Manager Keisha Matthews told her to "make that baby someone else's fucking problem." Ms. Matthews knew that the appointment was likely to take hours and acted with malice or reckless indifference. There is a causal connection between Plaintiff's protected activity and Defendants' unlawful employment practices. Plaintiff suffered damages as a result of Defendants' conduct.

91. As a direct and proximate result of Defendants' violations of the PUMP Act, Plaintiff suffered damages, including backpay, both economic and noneconomic compensatory

damages, physical pain and suffering, and emotional distress. Plaintiff suffered harm to her ability to nurse, which is both an inconvenience and a loss of enjoyment of life. Plaintiff is entitled to front pay because reinstatement is not practicable.

92. Defendants' violations were willful. Plaintiff is entitled to liquidated damages on all equitable and compensatory damages (i.e. backpay, front pay, and compensatory damages, both economic and noneconomic) to effectuate the purposes of the PUMP Act. Liquidated damages are compensatory, not punitive, in nature and are intended to capture harms that cannot be precisely measured. An award of liquidated damages is necessary to deter employers from future violations.

93. Further, an award of punitive damages is appropriate to effectuate the purpose of the PUMP Act because Defendants acted with malice or with reckless indifference to Mrs. Snider's federally protected rights.

THIRD CAUSE OF ACTION – TITLE VII – SEX DISCRIMINATION

94. Plaintiff is an employee within the meaning of Title VII and belongs to a class protected under the statute, namely she is female. *See* 42 U.S.C. § 2000e-5(f).

95. Defendants are employers within the meaning of Title VII. *See* 42 U.S.C. § 2000e(b).

96. Defendants violated Title VII with respect to the terms and conditions of Plaintiff's employment by subjecting her to a hostile work environment because she is female. This discrimination included but is not limited to subjecting Mrs. Snider to repeated derogatory and offensive comments about her decision to breastfeed, calling her "sick and disgusting," assigning her the degrading nickname ("pumper"), making vulgar comments about her breasts in front of male coworkers ("huge"), forcing her to endure mastitis and painful breast engorgement, creating stress and anxiety about her health and the health of her baby, and constructively discharging

Plaintiff because of her sex. The comments alleged above, particularly by Area Manager Keisha Matthews and Program Manager Tasha Yager, were badgering, harassing, and humiliating calculated to encourage Mrs. Snider to resign.

97. The hostile work environment was so bad that Mrs. Snider suffered physical injury: she developed mastitis twice and experienced a reduction in her milk supply that she was not able to restore fully even after quitting. As a consequence, Mrs. Snider was anxious about her baby's health and had to supplement her daughter with formula when she could not produce sufficient milk.

98. A reasonable person would have resigned under the same or similar circumstances.

99. As a direct and proximate result of Defendants' conduct, Plaintiff suffered damages. Defendants' conduct was willful and justifies an award of punitive damages.

FOURTH CAUSE OF ACTION – TITLE VII & PDA – PREGNANCY DISCRIMINATION

100. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

101. Plaintiff is an employee within the meaning of Title VII and belongs to a class protected under the statute, namely she was pregnant and had recently given birth and was nursing. See 42 U.S.C. § 2000e(k).

102. Defendants are employers within the meaning of Title VII. See 42 U.S.C. § 2000e(b).

103. Defendants violated Title VII by subjecting Plaintiff to a hostile work environment and constructively discharging her because of or on the basis of her sex, which includes pregnancy, childbirth, and the related medical condition of lactation. See *EEOC v. Houston Funding II Ltd.*, 717 F.3d 425, 427 (5th Cir. 2013). Plaintiff suffered an adverse employment action when she was

constructively discharged. Defendants' actions include but are not limited to failing to provide Mrs. Snider with an adequate private space to express breast milk; subjecting Mrs. Snider to a retaliatory hostile work environment and discouraging her from exercising her right to take breaks; directing her to pump in her car; forcing her to pump at her desk in front of a male coworker three times a day; forcing her to pump in front of a male client; subjecting her to derogatory comments about her nursing ("it's a sick pleasure"); assigning her a degrading nickname ("Pumper"); making her anxious about her health and her ability to feed her baby; making her to endure mastitis and painful breasts; requiring her to forgo pumping during a five-hour client appointment ("make that baby someone else's fucking problem"); and making vulgar comments about her body when she returned soaked ("Damn, your tits are huge." "They be looking huge."). These actions affected the terms, conditions, or privileges of Plaintiff's employment.

104. A reasonable person would have resigned under the same or similar circumstances.

105. As a direct and proximate result of Defendants' conduct, Plaintiff suffered damages. Defendants' conduct was willful and justifies an award of punitive damages.

FIFTH CAUSE OF ACTION – RETALIATION IN VIOLATION OF TITLE VII

106. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

107. Plaintiff is an employee within the meaning of Title VII and belongs to a class protected under the statute, namely she is female. *See* 42 U.S.C. § 2000e-5(f).

108. Defendants are employers within the meaning of Title VII. *See* 42 U.S.C. § 2000e(b).

109. Plaintiff engaged in protected activity including but not limited to the following: (1) making a discrimination complaint to HR Generalist Lisa Hernandez on April 26, 2024 about

the lack of adequate pumping space and ongoing harassment about her breastfeeding; (2) presenting PUMP Act literature to Program Manager Tasha Yager regarding Plaintiff's protected rights; and (3) objecting to Area Manager Keisha Matthews's harassment on multiple occasions throughout her employment. Plaintiff was aware of changes in the law, including the passage of both the PUMP Act and the PWFA. She reasonably believed that Defendants' conduct violated multiple laws.

110. Plaintiff suffered materially adverse employment actions which include but are not limited to being subjected to a retaliatory hostile work environment and discouraged from exercising her statutory right to take breaks, being issued a verbal warning for taking a break for pumping, being made anxious about her breast health and her ability to feed her infant, being made to endure painful mastitis, compelled to forgo pumping during a five-hour client appointment, and subjected to vulgar comments about her body upon returning. Plaintiff was constructively discharged. There is a causal connection between Plaintiff's protected activity and Defendants' unlawful employment practices. Plaintiff suffered damages as a result of Defendants' conduct. Defendants' conduct was willful and justifies an award of punitive damages.

<u>SIXTH CAUSE OF ACTION – PWFA – FAILURE TO ACCOMMODATE</u>

111. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

112. Plaintiff is an employee within the meaning of the Pregnant Workers Fairness Act (PWFA), 42 U.S.C. § 2000gg(3)(A), which incorporates the definition in Title VII, 42 U.S.C. § 2000e(f).

113. Defendants are a covered entity within the meaning of the PWFA, 42 U.S.C. § 2000gg(2).

114. Defendants violated 42 U.S.C. § 2000gg-1(1), (2), (3), and (5) by:

a. failing to make reasonable accommodation to the known limitations related to Plaintiff's pregnancy and related medical conditions, including lactation;

b. requiring Plaintiff to accept an accommodation other than a reasonable accommodation arrived at through the interactive process;

c. denying Plaintiff employment opportunities based on the need to make reasonable accommodations; and/or

d. taking adverse action against Plaintiff in the terms, conditions, and privileges of her employment.

115. Defendants' wrongful conduct includes but is not limited to:

a. Failing to provide Mrs. Snider with an adequate private space to express breast milk as a reasonable accommodation for her known limitation of lactation, despite her pre-hire disclosure of the need and her repeated subsequent requests;

b. Directing Mrs. Snider to pump in her car in a non-private, public parking lot;

c. Requiring Mrs. Snider to pump at her desk in front of a male coworker approximately three times a day;

d. Failing to participate in the interactive process to determine what, if any, reasonable accommodation would be needed;

e. Creating a hostile work environment; and

f. Constructively discharging Mrs. Snider.

116. As a direct and proximate result of Defendants' conduct, Plaintiff suffered damages and is entitled to backpay, front pay, and compensatory damages (both economic and noneconomic). Defendants' conduct was willful and justifies an award of punitive damages.

SEVENTH CAUSE OF ACTION – RETALIATION IN VIOLATION OF THE PWFA

117. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

118. Plaintiff is an employee within the meaning of the Pregnant Workers Fairness Act (PWFA), 42 U.S.C. § 2000gg(3)(A), which incorporates the definition in Title VII, 42 U.S.C. § 2000e(f).

119. Defendants are a covered entity within the meaning of the PWFA, 42 U.S.C. § 2000gg(2).

120. Plaintiff engaged in protected activity including but not limited to (1) requesting accommodations so that she could pump; (2) making a discrimination complaint to HR Generalist Lisa Hernandez on April 26, 2024 about the lack of adequate pumping space and ongoing harassment about her breastfeeding; (3) presenting PUMP Act literature to Program Manager Tasha Yager regarding Plaintiff's protected rights; and (4) objecting to Area Manager Keisha Matthews's harassment on multiple occasions throughout her employment. Plaintiff suffered materially adverse employment actions which include being subjected to a retaliatory hostile work environment and discouraged from exercising her statutory right to take breaks, being issued a verbal warning for taking a break for pumping, made anxious about her breast health and her ability to feed her infant, made to endure painful mastitis, compelled to forgo pumping during a five-hour client appointment, and subjected to vulgar comments about her body upon returning. Plaintiff was constructively discharged.

121. Defendants interfered with Mrs. Snider's statutory right to be free of coercion, intimidation, harassment, and threats in exercising her rights under the PWFA in violation of 42 U.S.C. § 2000gg-1(f)(2). All of the conduct alleged above constitutes interference with Mrs. Snider's right to request and use reasonable lactation accommodations and also constitutes a violation of her tight to be free of coercion, intimidation, harassment, and threats because she requested or used reasonable accommodations.

122. There is a causal connection between Plaintiff's protected activity and Defendants' unlawful employment practices. Plaintiff suffered damages as a result of Defendants' conduct and is entitled to backpay, front pay, and compensatory damages (both economic and noneconomic). Defendants' conduct was willful and justifies an award of punitive damages.

EIGHTH CAUSE OF ACTION –SEX AND/OR PREGNANCY DISCRIMINATION - TEXAS LAW (TCHRA)

123. Plaintiff is an employee within the meaning of the Texas Commission on Human Rights Act (TCHRA), Texas Labor Code § 21.002(7) and belongs to the class of employees protected under the statute, namely, female employees. See Texas Labor Code § 21.101.

124. Defendants are an employer within the meaning of Texas Labor Code § 21.002(8).

125. Defendants intentionally discriminated against Plaintiff because of her sex and/or pregnancy in violation of the Texas Labor Code by subjecting her to a hostile working environment, retaliating against her, and constructively discharging her. As a direct and proximate cause of Defendants' conduct, Plaintiff suffered damages. Defendants' conduct was willful and justifies an award of punitive damages.

## AGENCY

126. As Area Supervisor and Program Manager, Keisha Matthews and Tasha Yager are agents of Defendants, and Defendants are vicariously liable for their actions which were taken in the course and scope of their employment. Alternatively, Defendants were negligent because they knew or should have known about the harassment and discrimination and failed to stop it.

## EXHAUSTION OF ADMINISTRATIVE PROCEDURES

127. Plaintiff timely filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission (EEOC) against each Defendant on or about October 29, 2024, Charge No. 450-2025-01024 and Charge No. 450-2025-01025. Under the Work-Sharing Agreement between the EEOC and the Texas Workforce Commission Civil Rights Division (CRD), the Charge was deemed to be dually filed with CRD. Plaintiff timely filed her Complaint within ninety days of receiving the Right to Sue Notice on or about February 25, 2026.

## CONDITIONS PRECEDENT

128. All conditions precedent have been performed or have occurred.

## DAMAGES

129. Reinstatement is not practicable. Plaintiff has made diligent efforts to find comparable alternate employment. Plaintiff has suffered actual damages in the form of past and future lost wages, fringe benefits, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses. Plaintiff is entitled to liquidated damages under the PUMP Act. Plaintiff is entitled to punitive damages.

## ATTORNEYS' FEES

130. Plaintiff was forced to engage counsel to protect her rights. Plaintiff is entitled to an award of attorneys' fees and costs (including but not limited to an award of reasonable expert

witness fees) pursuant to 42 U.S.C. § 2000e-5(k), 29 U.S.C. § 216(b), and/or Texas Labor Code § 21.259.

INTEREST

131. Plaintiff is entitled to prejudgment and post judgment interest at the highest lawful rate.

JURY TRIAL DEMAND

132. Plaintiff demands a jury trial.

PRAYER

**WHEREFORE**, Plaintiff prays for judgment against Defendants for the following:

a. Past and future compensatory damages as alleged above;

b. Past and future lost wages and benefits (backpay and front pay);

c. Liquidated damages;

d. Punitive damages;

e. Attorneys' fees and costs;

f. Prejudgment and post-judgment interest;

g. Such other and further relief, at law or in equity, to which Plaintiff may show herself justly and lawfully entitled.

Respectfully submitted,

By: /s/ Holly B. Williams
Holly B. Williams
Texas Bar No. 00788674

**WILLIAMS LAW FIRM, P. C.**
1209 W Texas Ave
Midland, TX 79701-6173
432-682-7800
432-682-1112 (fax)
holly@williamslawpc.com

Kyla Gail Cole
Texas State Bar No. 24033113
**COLE/LEGLER PLLC**
3300 Oak Lawn Avenue, Suite 425
Dallas, TX 75219
(214) 748-7777
(214) 748 7778 (fax)
kyla@nlcemployeelaw.com

**ATTORNEY FOR PLAINTIFF**
**KYLIA SNIDER**

**CERTIFICATE OF SERVICE**

I hereby certify that on September 28, 2026, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Western District of Texas, using the electronic case filing (CM/ECF) system.

By: /s/ Holly Williams
Holly B. Williams